**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Ryann Jabre

   v.                                    Civil No. 11-cv-332-JL

Michael J. Astrue, Commissioner,
Social Security Administration


**REPORT AND RECOMMENDATION**


Pursuant to 42 U.S.C. § 405(g), Ryann Jabre moves to
reverse the Commissioner's decision denying her application for
supplemental security income, or SSI, under Title XVI of the
Social Security Act, 42 U.S.C. § 1382.  The Commissioner, in
turn, moves for an order affirming his decision.  For the
reasons that follow, I recommend that this matter be remanded to
the Commissioner for further proceedings consistent with this
report and recommendation.


**Standard of Review**

The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for
decisions on claims for disability insurance benefits); see also
42 U.S.C. § 1383(c)(3) (establishing § 405(g) as the standard of
review for SSI decisions).  However, the court "must uphold a
denial of social security . . . benefits unless 'the
[Commissioner] has committed a legal or factual error in
evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS,
76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490
U.S. 877, 885 (1989)).

     As for the statutory requirement that the Commissioner's
findings of fact be supported by substantial evidence, "[t]he
substantial evidence test applies not only to findings of basic
evidentiary facts, but also to inferences and conclusions drawn
from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916,
917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727,
730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more
than [a] mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.' "  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st
Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401
(1971)).  But, "[i]t is the responsibility of the [Commissioner]
to determine issues of credibility and to draw inferences from
the record evidence.  Indeed, the resolution of conflicts in the

evidence is for the [Commissioner], not the courts." <u>Irlanda Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (quoting <u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).

### Background

The parties have submitted a Joint Statement of Material Facts, document no. 12.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Jabre is twenty-four years old.  At the time of her hearing before the Administrative Law Judge ("ALJ"), in January of 2011, she had three children and was pregnant with a fourth.  Her work history consists of two one-month stretches at a fast-food restaurant.  She testified that she quit her first fast-food job because she thought she was being bullied and was fired from the

3

second one for failing to meet her employer's expectations.  See Administrative Transcript ("Tr.") 32.

Jabre first received mental-health treatment when she was seven years old.  In her teens, she was sexually molested by a stepbrother and raped by her mother's boyfriend.  Her mental-health records include references to suicidal ideation in March of 2008,[1] May and November of 2009, and November of 2010.  (She affirmatively reported a lack of active suicidal ideation in July, September, and December of 2008.)  Her medical records also include references to other forms of self-harm including pulling her hair out, hitting herself in the face, banging her head against a wall, and cutting.  She reported a near hospitalization for a cutting incident in December of 2008, and in May of 2009, she was hospitalized as a result of a suicide attempt by overdose.

Since 2007, Jabre has received the following mental-health diagnoses, listed in roughly chronological order: attention deficit hyperactivity disorder ("ADHD"), not otherwise specified ("NOS"); rule out post-traumatic stress disorder ("PTSD"); rule out major depression; rule out mood disorder; borderline personality disorder (diagnosed five times in total); bipolar affective disorder, depressed, nonpsychotic; ADHD, by history;

---

[1] At that time, however, she denied active suicidal plans.

obsessive compulsive disorder ("OCD"); major depression; panic disorder without agoraphobia; personality disorder with borderline features; bipolar disorder, NOS; PTSD (diagnosed twice); panic disorder with agoraphobia; mood disorder, NOS; rule out major depressive disorder, recurrent; dysthymic disorder (diagnosed twice); ADHD by history; OCD by history; depression; and major depression, recurrent, severe.  In addition, she has received the following global assessment of functioning ("GAF")[2] scores: 55 in November of 2007 (and 55 in the previous year),[3] 20 in January of 2008,[4] 30 in May of 2009

---

[2] "A GAF score represents 'the clinician's judgment of the individual's overall level of functioning.'"  Nickerson v. Astrue, No. 1:11-cv-87-GZS, 2012 WL 975641, at *2 n.2 (D. Me. Mar. 21, 2012) (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-VI-TR) 32 (4th ed. 2000).  "The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)."  Nickerson, 2012 WL 975641, at *2 n.2 (citation omitted).

[3] A GAF score of 51 to 60 indicates: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR, supra note 2, at 34.

[4] A GAF score of 11 to 20 indicates: "**Some danger of hurting self or others** (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (e.g., smears feces) **OR gross impairment in communication** (e.g., largely incoherent or mute)."  DSM-IV-TR, supra note 2, at 34.

(but 60 in the past),[5] 60 in May of 2009 (with 60 as the highest in the previous year), 48 in April of 2010 (with 55 as the highest in the previous year),[6] 55—60 in May of 2010 (and 60 in the past), and 42 in January of 2011.

Jabre's mental-health treatment has included individual therapy and functional support services, but has consisted primarily of medication, including Risperdol,[7] Ativan/Lorazepam,[8]

---

[5] A GAF score of 21 to 30 indicates: "**Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends)." DSM-IV-TR, supra note 2, at 34.

[6] A GAF score of 41 to 50 indicates: "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV-TR, supra note 2, at 34.

[7] Risperdal is a "trademark for preparations of risperidone." Dorland's Illustrated Medical Dictionary 1674 (31st ed. 2007). Risperidone is "a benzisoxazole derivative used as an antipsychotic agent." Id.

[8] Ativan is a "trademark for preparations of lorazepam." Dorland's, supra note 7, at 174. Lorazepam is "a benzodiazepine with anxiolytic and sedative effects, administered . . . in the treatment of anxiety disorders and short-term relief of anxiety symptoms." Id. at 1089-90.

Geodon,[9] benzodiazepine,[10] lithium,[11] Trazodone,[12] and Abilify.[13]
In June of 2010, Jabre was ordered by the Rochester District
Court to enroll in mental-health counseling as a condition of a
suspended sentence she received for simple assault.[14]

The record includes four assessments of Jabre's mental
functional capacity: (1) psychiatric evaluations completed in
December of 2008 by Dr. Sandra Vallery and Dr. Simon Eisen in
support of Jabre's application for aid to the permanently and

---

[9] Geodon is a "trademark for a preparation of ziprasidone
hydrochloride." Dorland's, supra note 7, at 783.  Ziprasidone
hydrochloride is "an antipsychotic used in the treatment of
schizophrenia." Id. at 2120.

[10] Benzodiazepine is "any of a group of compounds . . .
acting . . . as depressants of the central nervous system, their
actions including antianxiety, sedative, hypnotic, amnestic,
anticonvulsant, and muscle relaxing effects." Dorland's, supra
note 7, at 212.

[11] Lithium carbonate is "the carbonate salt of lithium, used
in the treatment of acute manic and hypermanic states in bipolar
disorder and in maintenance therapy to reduce the intensity and
frequency of subsequent manic episodes." Dorland's, supra note
7, at 1081.

[12] Trazodone hydrochloride is "an antidepressant used to
treat major depressive episodes with or without prominent
anxiety." Dorland's, supra note 6, at 1983.

[13] Abilify is a "trademark for preparations of
aripiprazole." Dorland's, supra note 7, at 4.  Aripiprazole is
"an antipsychotic . . . administered . . . in the treatment of
schizophrenia and of acute manic and mixed episodes of bipolar
disorder." Id. at 133.

[14] That conviction resulted from an incident in which she
kicked her husband in the groin and bit his arm.

totally disabled from the State of New Hampshire; (2) a
Psychiatric Review Technique authored in March of 2010 by Dr.
Michael Schneider; and (3) a Medical Source Statement of Ability
to do Work-Related Activities (Mental), completed in January of
2011 by Dr. Quentin Turnbull.  The record does not appear to
include a Mental Residual Functional Capacity ("RFC") Assessment
from a state-agency consultant.

After Dr. Vallery examined Jabre, she assessed her as
having a marked degree of functional loss with respect to daily
activities and a moderate degree of functional loss with respect
to social interactions.[15]  See Tr. 237.  She further indicated
that Jabre often had functional losses in the area of task
performance, work related,[16] and had repeated functional losses
in the area of stress reaction, work related.[17]  See id.  In the
prognosis section of the evaluation form, Dr. Vallery expected
that Jabre would have a moderately limited level of functioning
after treatment, opined that her probability of returning to
gainful employment after treatment was "guarded," and estimated

---

[15] Dr. Vallery chose from the following responses: "none,"
"slight," "moderate," "marked," and "extreme."  See Tr. 237,
241.

[16] Dr. Vallery chose from the following responses: "never,"
"seldom," "often," "frequent," and "constant."  Tr. 237, 241.

[17] Dr. Vallery chose from the following responses: "never,"
"once or twice," "repeated," and "continual."  Tr. 237, 241.

a return to work within three or four years, if Jabre complied with recommended treatment. See Tr. 238.

After Dr. Eisen examined Jabre, he assessed her as having a marked degree of functional loss with respect to both daily activities and social interactions. See Tr. 241. He further indicated that Jabre frequently had functional losses in the area of task performance, work related, and had continual functional loss in the area of stress reaction, work related. See id. In the prognosis section of the evaluation form, Dr. Eisen expected that Jabre would have a moderately limited level of functioning after treatment, opined that her probability of returning to gainful employment after treatment was "only fair," and estimated a return to work no earlier than four years in the future, if Jabre complied with recommended treatment. See Tr. 238.

In his psychiatric review technique, Dr. Schneider attempted to rate Jabre's functional limitations in terms of the "B" criteria of the listings. See, e.g., 20 C.F.R. Pt. 404, Supbt. P., App. 1 § 12.02B. But for three of the four relevant categories, i.e., activities of daily living; social functioning; and concentration, persistence and pace, he had insufficient evidence. See Tr. 362. In the only category he

was able to rate, Dr. Schneider noted that Jabre had had one or two episodes of decompensation of extended duration.  See id.

In his medical source statement, Dr. Turnbull rated Jabre in twenty functional abilities divided into four categories.  In the first category, understanding and memory, Dr. Turnbull found no limitation in one ability, slight limitation in one, and moderate limitation in one.  See Tr. 428.  Specifically, Dr. Turnbull noted that anxiety and depression had an impact on Jabre's memory.  See id.  In the second category, sustained concentration and persistence, Dr. Turnbull found no limitation in four abilities, moderate limitations in three, and extreme limitations in two: (1) the ability to work in proximity with others without being distracted; and (2) the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. See id. at 428-29.  Dr. Turnbull attributed both of those limitations to extreme anxiety.  See id. at 429.  In the third category, social interaction, Dr. Turnbull found slight limitations in two abilities, moderate limitation in one, and marked limitation in one, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  See id.  With regard to that marked

limitation, Dr. Turnbull wrote: "has trouble tolerating silence, consequently talks to ↓ anxiety."  Id.  Finally, in the fourth category, adaptation, Dr. Turnbull found no limitation in one ability, slight limitation in one, moderate limitation in one, and extreme limitation in one, the ability to respond appropriately to changes in the work setting.  See id.  Again, Dr. Turnbull attributed that limitation to extreme anxiety.  See id.

At Jabre's hearing, the ALJ posed two hypothetical questions to the vocational expert ("VE").  The first question described Jabre's mental abilities this way: "she has an eighth grade education and so the jobs would be at the unskilled level and she would have the ability to understand and remember and carry out simple instructions."  Tr. 51-52.  In response to that question, the VE identified five jobs Jabre could perform.  The second question incorporated all the limitations from Dr. Turnbull's medical-source statement.  According to the VE, "[t]he issue of extreme impairment with completing a normal workday and maintaining persistence and pace and requiring additional rest periods [posited by Dr. Turnbull] would make it impossible for a person to be competitively employed."  Tr. 54. After the hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

2.  The claimant has the following severe impairments: borderline personality disorder, depression, anxiety disorder, posttraumatic stress disorder, persistent lower back pain and obesity (20 CFR 416.920(c)).

. . . .

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CRF Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)F.

. . . .

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can lift 25 lbs. occasionally and 10 lbs. frequently, can stand or walk for 6 hours out of an 8-hour workday, and can sit for 6 hours out of an 8-hour workday.  She can only occasionally climb, balance, stoop, kneel, crouch, and crawl.  The claimant is limited to unskilled work. She has the ability to understand, remember and carryout simple instructions.

. . . .

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

Tr. 11, 12, 14, 22.  Based on the testimony of the VE, the ALJ

determined that Jabre was employable as a fast-food worker, as

an office mail clerk, as an office helper, as a cashier II, and

as a toll collector.

**Discussion**

According to Jabre, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) failed to give controlling weight to the opinion of her treating physician, i.e., Dr. Turnbull; and (2) substituted his own views for the uncontroverted medical evidence.[18]

A. The Legal Framework

To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The only question in this case is whether Jabre was under a disability.

For the purpose of determining eligibility for supplemental security income,

> [a]n individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

---

[18] Jabre also makes various observations concerning the ALJ's credibility assessment but does not appear to mount an actual argument that the ALJ committed reversible error by finding her statements about her symptoms to be less than fully credible.  The Commissioner responds by devoting considerable attention to defending the ALJ's credibility assessment but, again, the court does not understand Jabre to be making a credibility argument.

lasted or can be expected to last for a continuous
period of not less than 12 months. . . .

42 U.S.C. § 1382c(a)(3)(A).  Moreover,

[f]or purposes of subparagraph (A), an individual
shall be determined to be under a disability only if
[her] physical or mental impairment or impairments are
of such severity that [she] is not only unable to do
[her] previous work but cannot, considering [her] age,
education, and work experience, engage in any other
kind of substantial gainful work which exists in the
national economy, regardless of whether such work
exists in the immediate area in which [she] lives, or
whether a specific job vacancy exists for [her], or
whether [she] would be hired if [she] applied for
work. . . .

42 U.S.C. § 1382c(a)(3)(B).

To decide whether a claimant is disabled for the purpose of

determining eligibility for SSI benefits, an ALJ is required to

employ a five-step process.  <u>See</u> 20 C.F.R. § 416.920.

The steps are: 1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

<u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that she is disabled.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987).  She must do so by a preponderance of the evidence.  <u>See</u> <u>Mandziej v. Chater</u>, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing <u>Paone v. Schweiker</u>, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the [claimant] or other witness; and (3) the [claimant]'s educational background, age, and work experience.

<u>Mandziej</u>, 944 F. Supp. at 129 (citing <u>Avery v. Sec'y of HHS</u>, 797 F.2d 19, 23 (1st Cir. 1986); <u>Goodermote v. Sec'y of HHS</u>, 690 F.2d 5, 6 (1st Cir. 1982)).

## B. Jabre's Arguments

As noted, Jabre argues that the ALJ's decision cannot stand because he failed to give controlling weight to the opinion of her treating physician and substituted his own views for the uncontroverted medical evidence.  The Commissioner responds by contending that the ALJ's RFC assessment, his assessment of the medical opinion evidence, and his credibility assessment are all supported by substantial evidence.  The Commissioner addresses Jabre's second argument in a footnote: "[Jabre] argues that the ALJ improperly interpreted raw medical data in formulating the RFC assessment . . . but as explained below, the ALJ supportably

weighed the medical opinion evidence and made a common sense
judgment about [Jabre]'s functional capacity based on the
evidence of record."  Comm'r's Mem. of Law (doc. no. 10-1), at
3-4 n.2 (citation to the record omitted).  Jabre's second
argument is meritorious, and dispositive.

The court begins by observing that the record in this case
is somewhat unusual.  Dr. Schneider's psychiatric review
technique is largely inconclusive, and there is no mental RFC
assessment by a state-agency consultant.  Rather, the opinion
evidence in the record is limited to the opinions of Drs.
Vallery, Eisen, and Turnbull, all of which support Jabre's
claims of disability.  In other words, this is not a case in
which a claimant criticizes an ALJ for basing an RFC on the
opinion of a non-examining state-agency consultant rather than
the more favorable opinion of an examining or treating source.
Here, there is no medical opinion establishing that Jabre has
the mental RFC to perform substantial gainful employment.[19]
Thus, while the Commissioner is correct in his observation that
the ALJ is responsible for resolving conflicts in the evidence,
that rule has no particular applicability here, where there are
no medical opinions weighing against the ones the ALJ rejected.

---

[19] Because there is no medical opinion that contradicts the
ones in the record, the court need not resolve the parties'
dispute over whether Dr. Turnbull qualifies as a treating source
or is merely an examining source.

That is, there is no conflict in the medical opinion evidence for the ALJ to resolve.

The ALJ dealt with the medical opinion evidence by giving no weight to Dr. Schneider's psychiatric review technique because it provided no opinion of any sort.  See Tr. 20-21.  The ALJ says that he gave no weight to Dr. Schneider's opinion, but the reality is that there was no opinion to weigh in the first place.  The ALJ then gave relatively little weight to the opinions of Drs. Vallery and Eisen, on grounds that those doctors' opinions were inconsistent with their own treatment notes and were also contradicted by Jabre's reports of her activities of daily living.

In explaining his determination that the opinions of Drs. Vallery and Eisen deserved little weight, and elsewhere in his opinion, the ALJ relied heavily on evidence showing that Jabre was "the primary caregiver for her three children."  Tr. 21. According to the ALJ, Jabre's "ability to raise three children is strong evidence that she has the capacity to engage in full-time employment."  Tr. 20.  The ALJ even asked the VE about a job called "child monitor."  Tr. 52.

At her hearing, Jabre testified that she gets two of her children ready for school in the morning.  Tr. 33.  Later, her

attorney asked her about her statement that she tended to stay
in her room:

> Q  What does that mean?  Are you literally in
> your room for most of the day?
>
> A  Yeah, I'm literally in my room.  I yell at my
> kids from my bedroom and if I have to get up, I'll get
> up.  But for the most part, my husband takes care of
> the kids.

Tr. 40.  When describing what happens when she has a panic
attack, Jabre testified: "I get angry.  I just want it to go
away.  My tunnel vision, if my kids are like trying to talk to
me and I'm having a panic attack, I scream at them to just stop.
I just want life to stop for just five minutes just so I can get
back together."  Tr. 42.  Jabre also reported to one provider of
mental-health treatment that "she doesn't play with her
children" and that she yells at them "too much."  Tr. 389.  She
later reported to that same provider that "[s]he loves her
children but . . . that her inability to stay motivated has
caused her to need to give up custody of them in the past."  Tr.
382.  So, while Jabre has given birth to four children, and
lives in the same household with them, there is little
evidentiary support for either the ALJ's determination that
Jabre "is the primary caregiver for her three children," Tr. 21,
or his identification of her parenting ability as proof that she
is capable of full-time employment.

In any event, the more fundamental problem is the ALJ's decision to give substantial weight to Dr. Turnbull's opinion that Jabre was "capable of understanding, remembering, and carrying out short and simple instructions," Tr. 20, while giving the rest of his opinion little weight.  As a practical matter, it is difficult to know what the ALJ's "little weight" actually means.  The ALJ gave substantial weight to two of Dr. Turnbull's twenty specific opinions, i.e., findings that Jabre suffered from no limitation in her "ability to understand and remember very short and simple instructions," Tr. 428, and no limitation in her "ability to carry out very short and simple instructions," id.  To Dr. Turnbull's other eighteen opinions, the ALJ gave "little weight."  Those opinions include three extreme limitations, three marked limitations, four moderate limitations, and four slight limitation.  The ALJ, however, provides no explanation of how, exactly, he weighed Dr. Turnbull's opinions on those limitations.  Did he reduce each limitation by a set number of levels?  Did he reduce them all to the same level, such as "moderate," or "slight?"  Working backward from the ALJ's decision, and the VE testimony on which it was based, or, more properly, the hypothetical question on which the VE testimony was based, it would appear that the ALJ

reduced all of Dr. Turnbull's remaining limitations to "none."
But there is simply no way of knowing for certain.

At the conclusion of his step-two analysis, the ALJ
explained that "[t]he mental residual functional capacity
assessment used at steps 4 and 5 of the sequential evaluation
process requires a more detailed assessment by itemizing various
functions contained in the broad categories found in paragraph B
of the adult mental disorders listings in 12.00 of the Listing
of Impairments." Tr. 14. Those twenty function abilities are
set out in both the mental RFC assessment form used by state-
agency consultants and the medical-source statement form used by
a claimant's treating and/or examining sources. In the absence
of a mental RFC assessment by a state-agency consultant in this
case, Dr. Turnbull's medical-source statement is the only
opinion evidence in the record that addresses those twenty
functional abilities.

However, the ALJ appears to have rejected fourteen of Dr.
Turnbull's specific opinions. He did so by stating that Dr.
Turnbull's opinions were "largely inconsistent with the other
medical evidence of record." Tr. 20. While the court harbors
serious concerns over both the manner in which the ALJ rejected

Dr. Turnbull's opinions,[20] and the ALJ's failure to specifically describe Jabre's level of functioning in terms of the twenty functional abilities he appears to have identified as essential for a proper RFC assessment,[21] the dispositive question in this case is whether the ALJ was permitted to fashion an RFC without support from an expert opinion.  He was not.

As noted, this is not the typical case in which an ALJ based an RFC on a medical opinion less favorable to the claimant than the medical opinion the claimant would have preferred the ALJ to use.  Dr. Turnbull provided an opinion which, if adopted

---

[20] For example, the ALJ relied on Jabre's statement to Amy Szczechowicz that "her 'anxiety [was] fine now,' although her symptoms returned in certain situations," Tr. 21, as a basis for rejecting Dr. Turnbull's anxiety-based limitations.  Jabre's statement, however, was drawn from a progress note that also mentioned her anxieties over the condition of her home, going to the store, and riding in a car, along with her fear of being assaulted, her fear of needles, and her paranoia.  Based on the context in which it appears, Jabre's statement to Szczechowicz does not sound like substantial evidence supporting a determination that her ability to work was not significantly diminished by anxiety.

[21] While the ALJ indicated that a proper RFC assessment takes into account the specific functional abilities listed in the two applicable RFC assessment forms, his discussion of Jabre's RFC did not even address the four broad categories of functioning, much less the more specific functional abilities.  Rather, the ALJ's RFC discussion consists almost entirely of explanations for his negative credibility assessment and for his rejection of most of the medical opinions in the case.  The ALJ's decision not to credit Jabre's statements about her symptoms, and his disagreement with most of the conclusions that Drs. Vallery, Eisen, and Turnbull drew from their examinations of Jabre, is not substantial evidence supporting the RFC he ascribed to Jabre.

by the ALJ, would have resulted in a determination that Jabre is disabled.  The ALJ rejected much of that opinion, but did not do so by weighing it against an opinion from a different medical professional that indicated fewer limitations or a greater functional capacity.  Rather, the ALJ rejected Dr. Turnbull's opinion and went on to determine Jabre's mental RFC without the benefit of any opinion evidence to support his finding.  That was a mistake.

The court of appeals for this circuit has repeatedly held "that since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record."  Gordils v. Sec'y of HHS, 921 F.2d 327, 329 (1st Cir. 1990) (citing Rosado v. Sec'y of HHS, 807 F.2d 292, 293 (1st Cir. 1986); Berrios v. Sec'y of HHS., 796 F.2d 574, 576 (1st Cir. 1986); Perez Lugo v. Sec'y of HHS, 794 F.2d 14, 15 (1st Cir. 1986)).  Accordingly, when assessing a claimant's RFC, "[t]he general rule is that an expert is needed to assess the extent of functional loss."  Roberts v. Barnhart, 67 F. App'x 621, 622-23 (1st Cir. 2003) (citing Manso-Pizarro, 76 F.3d at 17).

That general rule, however, is subject to an exception: "the [Commissioner] is [not] precluded from rendering common-

sense judgments about functional capacity based on medical findings, as long as the [Commissioner] does not overstep the bounds of a lay person's competence and render a medical judgment." Gordils, 921 F.2d at 329. Thus, "an expert's RFC evaluation is required where 'the record . . . is sufficiently ramified that understanding it requires more than a layperson's effort at a commonsense functional capacity assessment.'" Roberts, 67 F. App'x at 623 (quoting Manso-Pizarro, 76 F.3d at 19)).

The general rule stated in Gordils applies with particular force in cases such as this, where an ALJ rejects the opinion of a medical professional as a step toward fashioning an RFC that is unsupported by any other medical opinion in the record. In Nguyen v. Chater, 172 F.3d 31 (1st Cir. 1999), the ALJ rejected a medical opinion "as inconsistent with 'actual findings made on exam and the degree of treatment needed,' the lack of 'recent treatment,' and some unspecified aspect of the entire record." Id. at 35 (footnote omitted). However, the medical opinion the ALJ rejected was uncontroverted by any other medical opinion in the record. See id. The court of appeals held that the ALJ committed reversible error by formulating an RFC that ran counter to the only medical opinion evidence in the record:

> The ALJ was not at liberty to ignore medical evidence
> or substitute his own views for uncontroverted medical

opinion.  Rose v. Shalala, 34 F.3d 13, 18 (1st Cir.
1994); Nieves v. Secretary of Health and Human
Services, 775 F.2d 12, 14 (1st Cir. 1985); Suarez v.
Secretary of Health and Human Services, 740 F.2d 1
(1st Cir. 1984) (per curiam).

       The Commissioner suggests that despite Dr.
Mahoney's opinion, the medical record supported the
ALJ's determination that claimant was fully capable of
performing sedentary work.  As a lay person, however,
the ALJ was simply not qualified to interpret raw
medical data in functional terms and no medical
opinion supported the determination.  Manso-Pizarro v.
Secretary of Health and Human Services, 76 F.3d 15
(1st Cir. 1996); Perez v. Secretary of Health and
Human Services, 958 F.2d 445, 446 (1st Cir. 1991);
Berrios Lopez v. Secretary of Health and Human
Services, 951 F.2d 427 (1st Cir. 1991); Gordils v.
Secretary of Health and Human Services, 921 F.2d 327,
329 (1st Cir. 1990).

Nguyen, 172 F.3d at 35.

       The ALJ in this case ran afoul of Gordils and Nguyen by

ascribing Jabre an RFC without the benefit of an expert medical

opinion supporting it.  That is because Jabre's mental-health

record is sufficiently complicated that drawing an RFC from it

requires more than a layperson's competence.  Jabre is twenty-

four years old and has suffered from mental impairments of one

sort or another since she was seven.  See Connolly v. Astrue,

Civ. No. 11-10798-RGS, 2011 WL 6888645, at *7 (D. Mass. Dec. 30,

2011) (finding claimant's mental-health history sufficiently

ramified where, among other things, claimant testified to having

been depressed for much of her life).  Jabre appears to have

spent her entire school career, which ended in the ninth grade,

in special education. See Tr. 446. In her teens, she was sexually assaulted by two different individuals in or close to her family. She has multiple diagnoses, which, even according to the ALJ, translate into no fewer than four different severe mental impairments. She has frequently thought about suicide, and has engaged in various forms of self-destructive behavior, including attempted suicide. She was ordered to enroll in mental-health counseling as a result of a criminal conviction. Given the longevity, complexity, and seriousness of Jabre's mental-health issues, the court has little difficulty concluding that it takes more than the common sense of a layperson to assess her mental-health records and determine a residual functional capacity for her.

Without support in the form of an expert medical opinion, the ALJ's RFC assessment is not supported by substantial evidence. See Nguyen, 172 F.3d at 35 (explaining that ALJ's factfinding is not conclusive when ALJ judges matters entrusted to experts) (citing Da Rosa v. Sec'y of HHS, 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz, 955 F.2d at 769). Because the ALJ based his decision on an RFC assessment that is not supported by substantial evidence, this case must be remanded for a proper RFC assessment.

**Conclusion**

For the reasons described above, I recommend that: (1) the Commissioner's motion for an order affirming his decision, document no. 10, be denied; and (2) Jabre's motion to reverse the decision of the Commissioner, document no. 9, be granted to the extent that the case is remanded to the Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011), cert. denied, 181 L. Ed. 2d 268 (2012); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge


April 5, 2012
cc:  Michael D. Seaton, Esq.
     Gretchen Leah Witt, Esq.